Last case of today, Lambert v. Warden Green SCI No. 16-1209, Ms. Sturm and Ms. Kiefer. Good morning, your honors. May it please the court, Cheryl Sturm for the appellant, Bernard Lambert. I respectfully request to reserve five minutes for rebuttal. You have it, no problem. Thank you, your honor. To supposition the state court's decision affirming Mr. Lambert's conviction for burglary, second-degree murder, and conspiracy were objectively unreasonable, where there was no evidence from which any rational juror could find beyond a reasonable doubt that Mr. Lambert had foreknowledge of Akhil Tillman's plan to burglarize the residence of Mr. Tillman's girlfriend and or shoot the girlfriend's mother. We understand that the evidence must be viewed... So what happened here was that Tillman's... the expert who met with Mr. Tillman testified, is that correct? Yes, your honor. And now we allow experts to rely on statements from non-testifying witnesses when those statements are used as the basis for the expert's opinion and they're not offered for the truth. Are you saying that the statements here were offered for the truth that there was a person who in effect told Tillman that he had to go back and he had to exact revenge or what? Well, your honor, what I'm saying is that the Supreme Court has never presented an exhaustive list of what is considered to be an inculpatory statement from a co-defendant. It doesn't have to be made to law enforcement. It doesn't have to be made under oath. We've cited cases in our brief where the expert witness in a child abuse case has testified about what the child told the expert and that was considered to be an incriminatory statement that was protected by the confrontation clause. So what we have here is an out-of-court statement by a co-defendant that is incriminating to the defendant without any redaction... By the co-defendant or by the co-defendant's expert? By the co-defendant, your honor. And what did he specifically say? She said... Okay, that's what I'm saying. Oh, I'm sorry, Mr. Tillman... I'm just trying to put a piece of it together. Okay, according to Mr. Tillman's psychiatrist, Ms. Kessel, what Mr. Tillman told her was... He was hearing voices outside his head. And the voice outside of his head said, you can't let them do that to you. Okay, you were beaten up. Okay, you have to do something about it. So that would be Mr. Lambert's participation, his foreknowledge of what Mr. Tillman was going to do. Okay, his participation, his aiding and abetting, his foreknowledge that Mr. Tillman was going to go back and commit some violent act. And this was after the trial judge had gone to great lengths to keep any kind of inculpatory statements out of the case. Exactly, your honor. And was this dwelled on by the prosecutor in the closing arguments? Yes, it was, your honor. What the prosecutor did during the closing argument was say to the jury, what do you think these people are doing when you're riding back in the car? What do you think they're talking about for 15 minutes? Of course they're talking about what happened.  That's a reasonable thing to say. I don't see anything wrong so far in what the prosecutor said. Except, your honor, that what the jury had heard is that Mr. Lambert drove Tillman back to the scene of the crime and that Mr. Lambert was outside of the house. And was waiting with the car running and saw the door being kicked down? I'm going to get to that, your honor. There's no evidence that he saw the door being kicked down. Okay, but he was there. He was there. There's also no evidence the car was running. He was in front of the door, or at least the car was in front of the door.  All right. And so it's not reasonable for a jury to determine that he would have at least heard the door being kicked down? And I guess there was damage to the door as well. Well, your honor, it's a little bit more than what's reasonable in Pennsylvania. Commonwealth versus Meredith controls and Jackson versus Virginia says that a federal court looking at a habeas petition on the sufficiency of the evidence issue has to follow Commonwealth versus Meredith. It's a Pennsylvania Supreme Court cited in our brief. And what Meredith requires is that inferences must be drawn from established facts and the inferred fact must flow beyond a reasonable doubt from the proven fact where the existence of one of the referred factors relied upon to establish the guilt of the accused or the existence of one of the elements of the crime. The constitutionality of standardized inference invoked to establish an essential element of the crime charged must be judged by the reasonable doubt standard. No, I follow that. But what I'm trying to find out is did the prosecutor make a specific reference to Dr. Kessel's testimony in the summation? She didn't make a specific reference to the testimony, but she filled in the blank of who was saying this to Mr. Tillman. Because it was only, okay, the witness said approximately, I know the Commonwealth wants to limit it to 15 minutes, so it was approximately a 15-minute gap. Mr. Lambert is in front of the house. Mr. Tillman hears this voice telling him to go back. Who else could have been saying it then except Mr. Lambert? No, I understand that. But I take it you're saying there was no specific reference in the summation to Dr. Kessel's testimony. She doesn't specifically refer to the testimony, but the problem is there was no limiting instruction at the time. No, I understand that. There was no limiting instruction. That's a different issue. Okay. Okay. So we have both a Bruton violation and I think a Richardson violation here. And the judge said specifically that he would not allow anyone in his courtroom, he said, to be convicted on statements of someone made out of court. And that surely is what we have here. If you're using Tillman's statement against Mr. Lambert, and there's no doubt that it was used against Mr. Lambert because it appears in the judge's opinion and the superior court had to rewrite its opinion and take it out. Okay. But I was still exploring my sufficiency of the evidence argument. And, again, going back to Commonwealth v. Mitchell, the superior court concluded that Mr. Lambert saw Tillman break down the front door when there was no evidence to support that inference. Okay. According to Meredith, you have to have as the basis before you get to the inference, a fact that is proven beyond a reasonable doubt, and then you have to prove the inference beyond a reasonable doubt. Okay. There was no testimony whatsoever. The only eyewitness and earwitness is Ms. Freeman. Ms. Freeman never saw Mr. Lambert at all until she's walked out of the house by Mr. Tillman. So she does not know what or where Mr. Lambert was at the time that Tillman entered. Secondly, there is no evidence that the door was broken down the second time. The door was broken in the first time. And what happened was a chair was put in front of the door, and the pictures showed that what had happened is the door had been pushed open, not broken down. And most significantly, again, looking at Ms. Freeman's testimony, she and her mother were upstairs, they were awake, and they did not hear Mr. Tillman until he walked into the bedroom upstairs. So there was no banging, breaking, pounding. There is no evidence of that. Okay. You have to have an established fact before you prove beyond a reasonable doubt, before you move on to your inference. So there is no evidence that the car was running. Excuse me. There is no evidence that Mr. Lambert heard anything. He was double parked on a one-way street. He could have been looking behind him to see what was coming if he needed to move. There is no evidence whatsoever established beyond a reasonable doubt that Mr. Lambert heard the break-in and that Mr. Lambert saw Mr. Tillman do anything that was out of the ordinary. Is there any evidence that Mr. Lambert knew that Tillman had a gun on him when he brought him back to the house? Absolutely none, Your Honor. No testimony. It was a revolver. It was not a shotgun or anything else. There was no evidence that Mr. Lambert knew there was a gun. Okay. The only evidence would be that Tillman left for 15 minutes and he came back with somebody driving him in a car. The person drove him there, waited outside, and Tillman went and killed one person and severely injured another. But no evidence that you know of other than what Kessel said relating to her conversations with Tillman that there was anything relating to another person, in effect, egging on Tillman to do this? Correct. Correct, Your Honor. But there was evidence to be clear that it was Lambert who was with Tillman when he came back. It was admitted by defense counsel in opening arguments. There was never a dispute. And the significance of this incident that we're talking about is what was used by the superior court, again in violation of Meredith where you have to have the fact beyond a reasonable doubt and the inference beyond a reasonable doubt to convict Bernard Lambert of second-degree murder. Okay, they said, hey, he was standing outside the car at the time Tillman was breaking down the door. No evidence to support that whatsoever. Zero evidence. Zero evidence. And he watched Tillman break in the door. Zero evidence to support that. Or he heard Tillman breaking down the door. Zero evidence to support that. The evidence is the contrary. The door was broken on the prior visit. He merely pushed it open, albeit there was a chair in front of it, without making so much noise that he was able to go upstairs and confront these two women in the bedroom without them ever knowing he was even in the house. So it's our position that although the standard is high, which is no evidence from which a rational juror could find to be under reasonable doubt that Lambert had foreknowledge of Achille Tillman's plan to burglarize the residence and or shoot the friend's mother, I believe in this case, we have met that. And the magistrate pointed out that when she brought up the... I think we've got the draft. Okay. I think this really is a good segue to some questions we have for Ms. Keefer and then we'll get you back in rebuttal. Okay. Thank you, Your Honor. Thank you. May it please the Court. My name is Catherine Keefer and I represent the appellees in the present case. We've spent quite a bit of time... At the outset, the problem you have here is things that... If I pick up Jim Smith and Jim Smith seems to be a little upset about something and he says, can you just drive me back to this particular place? And so I drive him back. You know, he's my friend. And the next thing I know, the guy is shooting someone. He shoots someone else. And I'm thinking, oh, my God. And the guy jumps in my car and he goes, okay, we're out of here. And so I take him and in that instance, am I liable for what Jim Smith does? You are, Your Honor. Pennsylvania law... I am. You are. I would suggest that that is not a fair recitation of all of the facts. I'm just giving you a theoretical. On that closed set that you just gave me, yes. I am never going to give Jim Smith a ride ever. Well, be careful. Accomplice liability, which is a lower standard than conspiracy under Pennsylvania law, and the Superior Court specifically found that Lambert was both a conspirator and an accomplice. Accomplice liability in Pennsylvania requires only the rendering of eight, which entails only providing a ride for someone as they want to leave the scene of a crime. That is enough. We may not like that. We may not think that's fair. But that's the law. That's a tough world we live in if that's the case. That is the law. And this Court is required. I mean, it's impossible for this Court to find that the Superior Court violated U.S. Supreme Court precedent in following their own law on this subject. So you're telling me forget whether there was any statement made by Tillman to Kessel. Correct. It's irrelevant. It is. The mere fact that Mr. Lambert drove Tillman back, waited outside, no evidence that Tillman even had a gun, Tillman goes in, shoots someone, kills the woman, and severely injures another person, Lambert is stuck just by the fact he gave the guy a ride. I would submit that's the case. Counsel would like you to pretend that Lambert was an Uber driver. That is really a toughie. That he just gave the guy a ride. Now, let's just think this through. Would an Uber driver stand outside on the street with the passenger door open in January, just waiting while his passenger goes inside? Would an Uber driver see the door broken down? And there is direct evidence of that. The first time Tillman entered the home, he broke the lock off the door. The second time, he pushed the door open. The third time, there is testimony by both Ms. Freeman and the police at the scene that the door was off of tinges and there were fresh splinters. So, yeah, he broke in the third time. And maybe Tillman saw it. Maybe Tillman heard it. Then, I'm sorry, maybe Lambert saw it. Maybe Lambert heard it. Then Tillman goes upstairs to the front bedroom, which is no more than 15 feet from where he's standing outside in January, just waiting with the door wide open, and a gunshot is fired. Would an Uber driver sit there and say, hmm, I'm going to stick around? Then he comes down dragging a woman out of the house at gunpoint. Would an Uber driver still stick around? There's a big difference between an Uber driver and somebody who's your friend. And the Supreme Court has said sometimes you're so far down you don't know what to do, but you really don't have the intent to commit a crime. Well, the intent is implied by the sticking around, Your Honor. When you decide to stay when your friend has killed someone and is about to shoot someone else, and the only thing you can say is not, oh, my gosh, man, what are you doing? The only thing you can say is, hurry up, let's get out of here so we don't get in trouble, then you're liable. He might have said that. He didn't testify. He might have said, oh, my God, what's that? The only thing you know he said is, hurry up, let's get out of here. So I would say on that entire set of facts, we have enough for conspiracy, which, again, counsel gets the law and the facts wrong. But the law for conspiracy is the following. It requires that you can reasonably infer the conspiracy. You can do that from these facts. And the only place in which you need prior knowledge is if all else there is is mere presence. But there's well more than mere presence in these circumstances. So prior knowledge is not required under conspiracy or accomplice liability. We would submit that Lambert is guilty under both, but certainly under the accomplice liability theory, wherein all he has to do is provide a ride, which he clearly did. Now getting to the procedural default question, we had a magistrate judge issue an R&R report and recommendation that finds merit to the Booten claim. And then the matter gets remanded and the magistrate judge is to address the question of whether there's been a procedural default here or whether there's ineffective assistance of PCRA counsel, post-conviction relief counsel. Why isn't that first finding sufficient to show that there's some merit to this claim such that there would be ineffective assistance of PCRA counsel in not pursuing it? It was a repealed, it was a pulled back decision. She asked for permission to reconsider both the merits and the issue of procedural default. The district court made such an order. Maybe I didn't ask the question correctly. I'm sorry if I misunderstood. What's the standard for determining some merit? Is it such that reasonable jurists could debate? Some merit to, I'm sorry, Your Honor. Some merit to the Booten claim. Well, I would say that. Is it sufficient that it's debatable among jurists or among reasonable jurists? Well, I think we have to start by determining whether or not this claim was fairly presented to the state courts or even in the lower courts. If it was not, then there is no standard. Then we're into the question of the ineffective assistance of PCRA counsel in not raising it. And it wasn't raised, all right? So you're right there. Right. So we've got to get to the question of whether or not the ineffective assistance of PCRA counsel excuses the procedural default. And it does not. But my question is, in determining ineffective assistance of counsel, aren't we to consider prejudice, and that is whether there is or was some merit to the Booten claim? That's correct. I mean, you kind of have to answer the question of the procedural default. In order to get to the merits, you have to sort of get to the merits. Right. And the fact that the magistrate judge found in the first instance that it was a meritorious claim, isn't that enough to say it's reasonably debatable? I don't believe so because I just don't think the analysis looked at whether or not the confrontation clause was considered at all. I mean, there's been some talk by counsel about whether or not it's Marsh or whether or not it's Booten and whether or not you can look at Crawford because Crawford came after the time of the crime. But this all comes down to the Sixth Amendment. And what that really comes down to is, was the statement testimonial? Was it given by someone who made an affirmance and a swearing that this was the truth? There was no requirement of that in his statement to Dr. Kessel. And was it done for the purpose of prosecution? Absolutely not. It was done for the opposite of prosecution. There are cases that show that it needs to be done for the purpose of prosecution in particular. And that just wasn't the case here. So we would submit that this absolutely did not involve the confrontation clause at all. Where it doesn't involve the confrontation clause, certainly counsel could not be ineffective for failing to lodge a meritless objection. What if we think it was testimonial? Then we have to go to, did counsel have a reasonable basis for not lodging the objection? As we argued in our brief, we believe that they did. The statement by Dr. Kessel that Tillman heard voices used the pronoun he, he, he over and over again. He heard voices. The voices were inside his head. The voices would criticize his behavior. The voices would tell him to do things. And in that mix was the possibility that the he might have been Lambert, but the he very easily could have been Tillman's voices himself, could have been Tillman himself. And it was not clear at all when Dr. Kessel gave that testimony. In fact, in my reading of it, it seemed more like the he referred to Tillman's voices than it did to Lambert. So the jury could have easily thought. What about the out of head? I'm sorry? What about the out of head? Well, I think it was all kind of mixed up. So I think it was very risky for counsel to seek an objection and have that kind of discussion in front of the jury, who would then really latch on to, okay, I kind of just assumed that this meant. Well, the discussion would have been at sidebar, wouldn't have been in front of the jury. It would have, but it still keys the jury into this is something important that's going on, something that they're fighting about. I want to figure out what it is that's really happening. So I think it was perfectly reasonable, and this court in particular has held that these types of strategic decisions of counsel not lodging an objection, that they might have a legitimate basis for lodging, is perfectly appropriate. And then once you get beyond that stage, we have the question of prejudice, which counsel merely presumes and doesn't prove at all. What about the prosecutor's closing argument? I think the prosecutor made fair inferences from Dr. Kessel's testimony. I don't think there was anything problematic about the prosecutor's closing. Do you remember, do you recall what the prosecutor said? I have it right here. He says, you only have 15 minutes in that 15-minute period. He's got to go. Get the gun, come back, ladies and gentlemen. The judge told you, and you can use reasonable inferences. In other words, use your common sense. They are in the car together. You don't think that they are talking about what just happened at all? It's just quiet? It's nothing? And again, this is January 21, 1999, the middle of winter. What's he doing just parking there? I think those are reasonable inferences. They are close friends. Lambert drives him back and forth frequently. Are we really supposed to believe that Tillman isn't telling Lambert what's going on? I think that's a fair inference, and I think that the prosecutor's statement to the jury. Then he goes on. He says, now in the conspiracy, what the Commonwealth needs to show is that there was an agreement to commit a crime and that there was an overt act. The overt act here by Lucky is that he is the getaway driver. That's Mr. Lambert. He brings a kill there. That's Tillman. He waits for him and helps him leave. The agreement doesn't have to be in words. I don't have to show you in words that he agreed. You can do that by your actions, and your actions, ladies and gentlemen, is waiting around, waiting for him to complete the crime, and the crime here, ladies and gentlemen, was burglary. And it's not burglary to get back his own money. It's not all about money. This is all about being dissed, ladies and gentlemen. Well, as far as setting forth the standard, I think that that was a fair recitation of the standard that we discussed earlier. But the inference has to be that, in effect, without there really being any evidence to that, that what the jury has to conclude, or the prosecutor's asking the jury to conclude, he's saying, you've got to go back in there, you've been dissed, and you've just got to take care of business. This isn't a burglary. In effect, you've got to blow him away. But there's no evidence of that. I just don't read it that way, Your Honor. I think it's entirely possible that Lambert was having those thoughts. I'm sorry, that someone was having those thoughts himself, based on what Dr. Kessel testified. And you're right, we don't know what they said. So if we can't make an assumption that Lambert had enough knowledge to know what was about to happen, we need to play fair and not make an unimportant assumption. And I realize that, based on what you said at the outset of this oral argument, that you don't need any of that. I don't. Just got to drive him there, wait, guy comes out, he's shooting people, he gets in, somebody says, hurry up, let's get out of here, and that's enough. It is. Who says, hurry up, let's get out of here? Lambert does. And Ms. Friedman was the one who heard that, who testified. Yes. She said he said it three or four times. Maybe I didn't ask the question properly, but did the prosecutor in summation specifically reference the testimony of Dr. Kessel that you just recited to us? Did he say, Dr. Kessel said so-and-so, and obviously did? Not to my memory, Your Honor. I think he – no, I don't. I don't know if the panel has any other questions. No, thank you. Okay, thank you so much for your time. Thank you. Ms. Stern. Your Honor, during the trial, the judge said this, knowing in advance what was going to be in the Kessel's testimony about the Tillman statement. We're talking about putting ourselves, as Strickland v. Washington requires, in the courtroom back in 1996. And what was the law then? The law was Richardson. And the judge said, I won't permit reference. That's all because you have a right to confrontation, and I think that is inviolable, period. Okay? It's a trial transcript that appears at AA-573. The judge says, I'm telling you right now, I will not permit a person to be accused by a person who is not on the stand. That's all. Again, from the same page. Okay, the superior court has to write a second opinion because it puts the Tillman statement in against Lambert. And the prosecution and the trial attorney contact the superior court and say, you can't do that. You can't use that out-of-court statement against Bernard Lambert. Now, Your Honor, what do you think the chances are that if defense counsel had asked for a limiting instruction when Richardson is in place, that he would not have gotten the Richardson instruction? He would have gotten the Richardson instruction because that judge and the Pennsylvania superior court agreed that Lambert was protected by the confrontation clause. I think that's reasonable jurists who could differ. On the record that we have before us, can we get to the question of whether there was a strategic basis not to object or ask for a limiting instruction? In other words, the Commonwealth has argued that you have been highlighting it impermissibly. It is sort of an unclear reference in my mind. The magistrate's report and recommendation says, hey, if we're going to grant relief on this, we should have an evidentiary hearing. But I would call the court's attention to the circuit's opinion in Addison v. Cattell, C-A-T-T-H-E-L, 633 Fed 3rd, 248, 3rd Circuit, 2011, footnote 10. It says, the state's suggestion that Addison's counsel made a strategic decision to avoid drawing the jury's attention to the accomplice statement strains credulity since those statements comprise the essence of the state's rebuttal to Addison's dispense and were specifically brought to the attention of the jury in closing argument. And that, I would suggest, is what happened here. I don't see, and I've read the closing argument, I didn't see any specific reference to Dr. Kessel's testimony in relation to statements heard inside or outside the head. But that's not all that's required. It's not okay for the prosecutor to go and do an end run around the redaction. There was to be no reference to Bernard Lambert in connection with that statement. No reference to Bernard Lambert in connection with Tolman's statement. That's what the judge ruled. It would be sanitized so you could not tell Bernard Lambert was involved in that statement. The prosecutor makes the connection in closing argument. And as far as the prosecution's argument today about what exactly Kessel's testimony was specifically, that she wrote down from the way she recorded it and the way she remembered it, what Tolman was saying, those voices came from outside of my head. And she could not have been any clearer about that, Your Honor, that that is exactly what she is saying, that the voice came from outside of her head. And if the Confrontation Clause issue is that X said, without giving the name, you've got a problem and the voices outside the head can only mean X because only one person was in the car. She limited it to when, this 15 minutes, they're talking about something. Okay, we just heard Kessel say, without any limiting instruction for the jury, listen, this is what he told me he heard. And she could not have been clearer, Your Honor. Also, looking at this from the perspective of Brown v. SCI, 834, Fed 3rd, 506, decided by the Third Circuit this year, says there is no point in redacting or sanitizing an otherwise inculpatory statement of a non-testifying co-defendant to facilitate a joint trial. I'm pretty familiar with that. Okay. All right. Thank you, Your Honor. And so it would be our position that that is what happened here, Your Honor. Thank you. Thank you to both counsel. I would ask if counsel could get together with the clerk's office and have a transcript prepared of this whole argument and to split the cost, please. And I do that in the clerk's office, Your Honor? I believe so. That's correct. Or, Jeanne, is that correct? Or Susan, Susan, excuse me.  I should have ripped on you, Your Honor. Thank you very much. Thank you. Thank you. Ms. Bride, please stand adjourned until 2 PM tonight.